**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

DR. CAMILLE KAMGA,

     *Plaintiff*,

   vs.

U.S. DEPARTMENT OF
TRANSPORTATION, *and* SEAN DUFFY,
in his official capacity as Secretary of
Transportation,

     *Defendants*.

Case No.: 26 Civ. 5292

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1. Plaintiff Camille Kamga, Ph.D., brings this action in his individual capacity as a professor and transportation researcher to challenge the unlawful and unconstitutional termination of a federal research grant awarded through the U.S. Department of Transportation (DOT) University Transportation Centers (UTC) program.

2. Dr. Kamga is a well-respected leader in transportation research, education, and technology.  In addition to conducting his own research, he manages a long-standing consortium of colleges and universities across New York, New Jersey, Puerto Rico, and the U.S. Virgin Islands that has worked for decades to advance transportation research, educational programming, and cutting-edge technologies.  Focused on a geographic region that spans both the nation's most populous city and vast rural areas—a region that is home to global exporters of agricultural products and millions of small businesses alike—Dr. Kamga and his colleagues in the consortium address complex, multifaceted transportation challenges.  Dr. Kamga has long used federal grants from DOT to support his work and has come to rely on them as a stable, robust source of funding for both his own research and that of the consortium.

3. Recognizing the critical role that research like Dr. Kamga's plays in developing the nation's infrastructure and facilitating economic growth, Congress created the UTC Program in 1987 to fund cutting-edge transportation research at institutions of higher education.  In the decades that followed, Congress reauthorized the UTC Program numerous times, each time instructing the Secretary of Transportation to select colleges and universities to serve as UTCs according to statutorily prescribed criteria and priorities, and to award each a grant to fulfill its duties as a UTC.  Most recently, Congress authorized more than $80 million in grants, directing

the Secretary of Transportation to designate and fund five national UTCs, ten regional UTCs, and not more than twenty Tier 1 UTCs.

4.    In 2022, members of the consortium led by Dr. Kamga applied to this latest iteration of the UTC Program, seeking to serve as the UTC for Region 2, an area that covers New York, New Jersey, Puerto Rico, and the U.S. Virgin Islands.  As detailed in the grant application, the research and work would be led by Dr. Kamga and carried out by faculty and researchers at the consortium through the Center for Social and Economic Mobility for People And Communities through Transportation (SEMPACT).  In 2023, following a rigorous application process that required applicants to demonstrate compliance with both an established statutory framework and detailed agency objectives, SEMPACT was awarded a multi-year, multi-million dollar grant.

5.    Until recently, federal grants were allocated pursuant to congressional authority, flowing from statutes and funding appropriations to the agencies tasked by Congress to operationalize those statutory directives.  The grantmaking process required these agencies to comply with established constitutional protections and due process principles in awarding or terminating grants.  And agencies' decisions to award, modify, or terminate grants were to be made consistent with the requirements of the Administrative Procedure Act (APA).

6.    Following President Trump's second inauguration, Defendants ignored these legal obligations and procedural safeguards and sought to advance President Trump's anti-diversity, equity, and inclusion objectives through wholesale, arbitrary, and unlawful grant terminations.  As part of this crusade, DOT abruptly terminated the grant on which Dr. Kamga and many others relied.  Defendants derided SEMPACT's research as "woke" and part of a "DEI & Green New Scam agenda" and attempted to justify the termination by citing a full philosophical reversal on the agency's objectives for the grant program.  But Defendants did not have the authority to change

the grant program's priorities, and they certainly may not do so as a barely veiled pretext for targeting ideas or people they do not like.

7.    As a result, Dr. Kamga challenges the grant termination as a violation of the Constitution's guarantees of free speech, equal protection, and due process, as well as the APA, and as a flagrant overreach of executive power over congressional authority.

8.    Defendants' unlawful grant termination immediately and concretely impaired— and continues to impair—Dr. Kamga's ability to perform and direct his research, as well as his professional reputation as a principal investigator entrusted with major federal awards.  But the impact of Defendants' actions is not limited to Dr. Kamga.  The grant termination has jeopardized ongoing regional partnerships and programming and disrupted graduate and workforce pipelines under Dr. Kamga's direction.  And it will deprive the public of the knowledge and technological advancements that Dr. Kamga and so many others were pursuing through the SEMPACT grant.

9.    Dr. Kamga will continue to suffer harm absent the declaratory and injunctive relief sought.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case arises under the Constitution and laws of the United States, including the First Amendment to the United States Constitution; the Fifth Amendment to the United States Constitution; and the Administrative Procedure Act, 5 U.S.C. §§ 702, 706.[1]

11.    This Court has authority to grant declaratory and injunctive relief pursuant to 28

---

[1] Dr. Kamga files this action for equitable relief from Defendants' termination of the SEMPACT grant, and does not waive any rights he or any other party may have to challenge any related agency action in any other forum.  *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2660–62 (2025) (Barrett, J., concurring).

U.S.C. §§ 2201–2202, Federal Rules of Civil Procedure 57 and 65, the Administrative Procedure Act, 5 U.S.C. § 706, the All Writs Act, 28 U.S.C. § 1651, and the Court's inherent equitable powers.

12.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## THE PARTIES

13.    Plaintiff is Dr. Camille Kamga.  Dr. Kamga is a Professor of Civil Engineering at The City College of New York (CCNY), a constituent college of the City University of New York (CUNY), as well as the Director of SEMPACT and the University Transportation Research Center, where SEMPACT is housed.

14.    Defendant U.S. Department of Transportation (DOT) is a federal agency headquartered in Washington, D.C.  DOT administers the UTC Program pursuant to 49 U.S.C. § 5505 and is responsible for the award, oversight, and termination of grants under that program.

15.    Defendant Sean P. Duffy is the U.S. Secretary of Transportation.  He is sued in his official capacity.

## FACTUAL ALLEGATIONS

**I.    The Trump Administration's Crusade Against Purportedly "Woke" Colleges and Universities**

16.    Leading up to his election in November 2024, President Trump promised to curtail free speech on academic campuses.  He pledged to "reclaim our once great educational institutions from the radical Left" and "remov[e] all Marxist diversity, equity, and inclusion bureaucrats."[2]  He

---

[2] *Agenda47: Protecting Students from the Radical Left and Marxist Maniacs Infecting Educational Institutions* (July 17, 2023), https://web.archive.org/web/20250502193935/https://www.donaldjtrump.com/agenda47/agenda4

declared that "there will be no wokeness . . . allowed."[3]

17.    On January 20, 2025, President Trump signed Executive Order 14151, titled "Ending Radical and Wasteful Government DEI Programs and Preferencing," which described "'diversity, equity, and inclusion' (DEI)" initiatives as "illegal and immoral discrimination programs."[4]  This Executive Order directed each agency head, in concert with the Office of Management and Budget (OMB), the Office of Personnel Management (OPM), and the Attorney General, to "terminate, to the maximum extent allowed by law, all . . . 'equity-related' grants or contracts."[5]

18.    The next day, President Trump signed Executive Order 14173, titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," proclaiming that "'diversity, equity, and inclusion' (DEI)," and "'diversity, equity, inclusion, and accessibility' (DEIA)" policies are "dangerous, demeaning, and immoral."[6]  This Executive Order required agency heads to forbid recipients of federal grants and contracts from operating "programs promoting DEI that violate any applicable Federal anti-discrimination laws."[7]  It further directed OMB and the Attorney General to "[t]erminate all 'diversity,' 'equity,' . . . 'equitable deployment of financial

---

7-protecting-students-from-the-radical-left-and-marxist-maniacs-infecting-educational-institutions.

[3] *Agenda47: The American Academy* (Nov. 1, 2023), https://web.archive.org/web/20250501043849/https://www.donaldjtrump.com/agenda47/agenda47-the-american-academy.

[4] Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025).

[5] *Id.*

[6] Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025).

[7] *Id.*

and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities."[8]

19.    Neither Executive Order 14151 nor Executive Order 14173 define the terms "DEI," "DEIA," "diversity," "equity," "inclusion," or "accessibility."

20.    Following suit, OMB issued a memorandum requiring all agencies to "temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for . . . DEI, woke gender ideology, and the green new deal."[9]

21.    These directives ultimately led to the termination of billions of dollars in university grant funding at leading research institutions.   Often such terminations explicitly targeted institutions or research that was, in the Trump Administration's view, too "liberal" or "woke."  For example, shortly after freezing over $2.2 billion of Harvard University's federal funds, President Trump took to social media to decry Harvard as a "Far Left Institution," "a Liberal mess," and "a threat to Democracy."[10]  And after negotiations seeking to restore Brown University's frozen federal research funding, President Trump posted that "Woke is officially DEAD at Brown."[11]

22.    President Trump has also made his political motivations clear through his geographic focus, with cuts primarily targeting blue states and cities—in particular New York. Indeed, New York documented over $1.3 billion in federal cuts to state funding in the first 100

---

[8] *Id.*

[9] *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs*, Off. of Mgmt. & Budget (Jan. 27, 2025), https://perma.cc/T2FG-JVK3 (emphasis omitted).

[10] Donald Trump (@realDonaldTrump), Truth Social (Apr. 24, 2025 at 09:33   EST), https://truthsocial.com/@realDonaldTrump/posts/114393194962253226.

[11] Donald Trump (@realDonaldTrump), Truth Social (July 31, 2025 at 09:01 EST), https://truthsocial.com/@realDonaldTrump/posts/114947973077448174.

days of the second Trump Administration.[12]

23.    The Trump Administration's effort to punish New York has included transportation policy and funding.  For example, in the spring of 2025, Secretary Duffy took aim at New York City's congestion pricing program, threatening the state with "serious consequences" if it did not comply with the Trump Administration's demands.[13]

24.    The Administration's crusade eventually reached Dr. Kamga.

## II.    The University Transportation Center Program

25.    Congress created the University Transportation Center (UTC) Program in 1988, originally funding ten regional transportation centers at nonprofit institutions of higher learning. Surface Transportation and Uniform Relocation Assistance Act of 1987, Pub. L. No. 100-17, § 314, 101 Stat. 132, 230–32.  According to the statute, the regional centers' primary purpose would be conducting transportation-related research.  *Id.*

26.    Over the next several decades, Congress reauthorized and expanded the scope of the UTC Program.[14]  The Intermodal Surface Transportation Efficiency Act (ISTEA) of 1991, for example, added educational programming and technology transfer as objectives of the UTC Program, in addition to the program's ongoing commitment to transportation research.  Pub. L. No. 102-240, § 6004, 105 Stat. 1914, 2169 (education); Pub. L. No. 102-240, § 6001 (technology

---

[12] Press Release, N.Y. Governor Kathy Hochul, 100 Days of Turmoil: Governor Hochul Marks Trump's Impacts on New York State (Apr. 29, 2025), https://perma.cc/QQ8P-8CBB.

[13] Letter from Secretary Duffy to the Honorable Kathy Hochul, Governor of New York (Apr. 21, 2025), https://www.transportation.gov/sites/dot.gov/files/2025-04/Gov.%20Hochul%20Cordon%20Letter_4.21.25_Signed.pdf; Press Release, U.S. Dep't of Transp., U.S. Transportation Secretary Sean P. Duffy to Gov. Hochul: Here's What Continuing Your Illegal Toll Could Cost You (Apr. 21, 2025), https://www.transportation.gov/briefing-room/us-transportation-secretary-sean-p-duffy-gov-hochul-heres-what-continuing-your.

[14] *Program History*, U.S. Dep't of Transp. (last updated Apr. 15, 2025), https://perma.cc/QM4H-2GLL.

transfer).[15]  Through the ISTEA and subsequent reauthorizations, Congress also directed the creation of certain centers to achieve more specific purposes, including, for example, "[t]o accelerate the involvement and participation of minority individuals and women in transportation-related professions."  Pub. L. No. 102-240, § 6023.  In 2015, Congress instructed the Secretary to award grants that "further[]" six statutory research priorities: "(A) improving mobility of people and goods; (B) reducing congestion; (C) promoting safety; (D) improving the durability and extending the life of transportation infrastructure; (E) preserving the environment; and (F) preserving the existing transportation system."  Fixing America's Surface Transportation (FAST) Act, Pub. L. No. 114-94, § 6503, 129 Stat. 1312, 1580 (2015).

27.    Most recently, in 2021, Congress reauthorized the UTC Program with the Infrastructure Investment and Jobs Act (IIJA), adding a seventh statutory research priority: "reducing transportation cybersecurity risks."  49 U.S.C. § 6503(c)(1)(G).  The IIJA also directed the Secretary to establish "nonexclusive candidate topic areas" within each of the statutory research priorities, and to then award grants in these established topic areas.  49 U.S.C. § 5505(b)(4)(A); *see* 49 U.S.C. § 6503(c)(1).

28.    The IIJA authorized more than $80 million for each fiscal year from 2022 through 2026 to fund five national, ten regional, and not more than twenty Tier 1 centers, Pub. L. No. 117-58, § 11101, 135 Stat. 429, 447 (2021), and provided that each regional center should be awarded between $1.5 million and $3 million a year for the duration of the program, 49 U.S.C. § 5505(c)(3)(C).

---

[15] *Id.*

### III.    SEMPACT's Regional UTC Designation, Grant Award, and Corresponding Work

29.    In May 2022, DOT announced a new grant competition for the UTC Program as authorized by the IIJA, and published a corresponding Notice of Funding Opportunity (NOFO).[16] A NOFO is the agency's "formal announcement" of available funding that "provides information on the award, such as who is eligible to apply, the evaluation criteria for selecting a recipient or subrecipient, the required components of an application, and how to submit the application." 2 CFR § 200.1. As set forth in the IIJA, the NOFO provided that DOT would select ten regional UTCs to each receive awards of up to $3 million annually for fiscal years 2022 through 2026, which recipients were required to match with non-federal funds equal to their federal award.[17]

30.    This time around, the UTC Program—effectuated through these awards—"both sustain[ed] existing and establishe[d] new and vital initiatives in transformational research, education and workforce development, and technology transfer that benefit the U.S. traveling public, freight movement, and the safety and efficiency of the U.S. transportation system, while addressing . . . issues of transportation accessibility and equity."[18]

31.    To this end, the NOFO required applicants seeking to serve as a regional UTC to "focus their efforts"—and therefore, necessarily, their grant applications—on "one or more of the seven statutory research priority areas" while also "address[ing] what the Regional UTC identifies as regional needs."[19] The NOFO identified "[t]ransportation [e]quity" as a "candidate topic area"

---

[16] U.S. Dep't of Transp., Notice of Funding Opportunity for the Univ. Transp. Ctrs. Program (May 2022), https://www.transportation.gov/sites/dot.gov/files/2022-05/UTC%20NOFO%202022.pdf.
[17] *Id.* at 10–14.
[18] *Id.* at 7.
[19] *Id.* at 11 (citing and quoting 49 U.S.C. § 6503(c)(1) (statutory research priorities)).

within the statutory research priority of "Improving Mobility of People and Goods."[20] *See supra* ¶ 27. Applicants were also to be assessed on how their proposals supported DOT's "Strategic Plan Goals" for fiscal years 2022 through 2026,[21] which, like the NOFO, included "equity" as a strategic goal.[22] Finally, the NOFO encouraged applicants to consider how their grant proposals would advance related DOT efforts, such as "expand[ing] [transportation] access and opportunity to all communities while focusing on underserved, overburdened, and disadvantaged communities" and the Executive Order titled "Advancing Racial Equity and Support for Underserved Communities Through the Federal Government."[23]

32. SEMPACT applied to serve as the regional UTC for Region 2. Consistent with both the IIJA and the NOFO, SEMPACT focused its proposed research on the statutory research priority of "[i]mproving mobility of people and goods," and, as encouraged by DOT, explained how its efforts would advance DOT's Strategic Plan Goals, including equity.

33. SEMPACT's proposed projects included a comprehensive report on transportation challenges in the region, as well as topical research on, among other things, highway bridge-collapse prevention, freight supply chain improvements, and more resilient transportation infrastructure to withstand major events such as Hurricane Sandy, which devastated the region. These projects were to be spearheaded by researchers, including Dr. Kamga, with decades of experience leading cutting-edge transportation research.

---

[20] *Id.* at 21.

[21] *Id.* at 23.

[22] U.S. Dep't of Transp., *Strategic Plan FY 2022–2026*, at IV, 19–23 (Jan. 2023), https://www.transportation.gov/sites/dot.gov/files/2025-01/U.S.%20Department%20of%20Transportation%20Strategic%20Plan%20FY%202022-2026.pdf.

[23] UTC May 2022 NOFO, *supra* note 16, at 8.

34.    The application named Dr. Kamga as the Center Director, akin to the "Chief Executive Officer," of SEMPACT.   In this role, Dr. Kamga would be "responsible for implementing the Center's programs and ensuring compliance with all other UTC Program requirements."  Specifically, he would have "overall Center responsibility, including the conduct of all programs, development of new initiatives and public presentation of SEMPACT business and accomplishments," and would "serve as liaison with USDOT, sponsors and other groups."

35.    Dr. Kamga's own research featured prominently in SEMPACT's application.  He first planned to lead the comprehensive transportation assessment across the region, aiming to identify the region's most critical research needs to better inform SEMPACT's subsequent work. Dr. Kamga then expected to conduct targeted research to, among other projects, develop models to reduce traffic congestion, assess the feasibility of an online platform to manage employee shuttles during busy commutes, and investigate barriers to deploying safe, driverless rideshares.

36.    Following a full and open competition for the grant awards, SEMPACT was designated as the Region 2 UTC and awarded a grant totaling $15 million to be disbursed in annual increments over the following five years.  DOT publicly announced the award selections and UTC designations—including SEMPACT's designation as the Region 2 UTC—on February 21, 2023.[24]

37.    DOT disbursed the first two installments of grant funds in 2023 and 2024, totaling $5,947,770.  SEMPACT accessed these funds by submitting reimbursement requests to DOT and had until May 31, 2029 to incur costs for reimbursement.

---

[24] 2022 Bipartisan Infrastructure Law University Transportation Centers Program Competition, U.S. Dep't of Transp. (Feb. 21, 2023), https://perma.cc/KWE2-VQK5; Infrastructure Investment and Jobs Act (IIJA) Centers and Grantees, U.S. Dep't of Transp. (archived Apr. 18, 2025), https://web.archive.org/web/20250418124541/https://www.transportation.gov/utc/iija-centers-and-grantees#Regional.  SEMPACT has since been removed from this list.  *See* Infrastructure Investment and Jobs Act (IIJA) Centers and Grantees, U.S. Dep't of Transp., https://perma.cc/4W3S-BUQQ (last visited June 17, 2026).

38.     As the UTC for Region 2, SEMPACT carried out its work as promised in its application, which was incorporated into the grant agreement as SEMPACT's statement of work, and complied with all its grant-imposed obligations.  Per the statutory priorities, much of its research focused on improving the resilience of critical transportation infrastructure, which supports safer travel, more reliable commerce, and reduced risks to local communities and the broader economy.  For example, one research team set out to modernize the risk assessments used to protect bridge piers from large ship impacts, helping prevent catastrophic bridge collapses like the Francis Scott Key Bridge disaster.[25]  Another team evaluated alternative technologies to protect bridges from overheight vehicle collisions, seeking to lessen the resulting structural damage, traffic disruptions, and costly repairs.[26]

39.     The grant also funded multiple projects seeking to quantify the "persistent and escalating challenge" of flooding in urban areas "due to its widespread and adverse impacts on transportation and the normal functioning of the economy."[27]  Specifically, the research focused on developing models to better predict urban stormwater flooding.  These improved predictions

---

[25] *Collapse of Francis Key Bridge: Protection of Bridge Piers from Large Ship Impacts*, University Transportation Research Center, https://utrc2.org/research/projects/collapse-francis-key-bridge-protection-bridge-piers-large-ship-impacts (last visited June 17, 2026).

[26] *Protection Technologies for Bridges Against Overheight Impacts*, University Transportation Research Center, https://utrc2.org/research/projects/protection-technologies-bridges-against-overheight-impacts (last visited June 17, 2026).

[27] *Enhancing and Validating Models for Predicting Urban Stormwater Flooding*, University Transportation Research Center, https://utrc2.org/research/projects/enhancing-and-validating-models-predicting-urban-stormwater-flooding (last visited June 17, 2026); *Predicting Urban Stormwater Flooding Using Geomorphic Information*, University Transportation Research Center, https://utrc2.org/research/projects/predicting-urban-stormwater-flooding-using-geomorphic-information (last visited June 17, 2026); New Jersey Inst. of Tech., Final Report: Predicting Urban Stormwater Flooding Using Geomorphic Information, SEMPACT (Aug. 31, 2024), https://utrc2.org/sites/default/files/applications/SEMPACT_FinalReport_Yr1_NJIT_Boufadel_StormWater.pdf.

would, in turn, enable urban planners, emergency responders, and transportation agencies to implement more effective flood preparedness and response initiatives, thereby mitigating the health, safety, and economic impacts of flooding across the region and beyond.

40.    Another grant-funded project sought to develop a roadmap for small- and medium-sized transit agencies using artificial intelligence.  The project hoped to enable transit agencies to better coordinate and leverage a range of AI capabilities, from "predictive maintenance and demand forecasting to autonomous vehicle operations and real-time passenger information systems."[28]

41.    As required by statute, the grant also supported various STEM education and workforce development programs, such as an Automotive Technology job readiness program that prepares graduates for entry-level automotive industry positions—ranging from diagnostician to equipment sales and service to dealership service manager—without first attending college.[29]

42.    Across SEMPACT, the grant funded the critical research projects of approximately 25 faculty members and principal investigators, including Dr. Kamga, and 35 graduate and undergraduate researchers, and enabled collaboration between multiple local agencies and university partners.

43.    On January 16, 2025, Mr. Caesar Singh, DOT's Director of University Research, Technology & Education, emailed Dr. Kamga and the other Center Directors with instructions for receiving their third installment of the UTC Program grant funds.

---

[28] *Roadmap of AI Developments for Small and Medium Size Transit Agencies*, University Transportation Research Center, https://utrc2.org/research/projects/roadmap-ai-developments-small-and-medium-size-transit-agencies (last visited June 17, 2026).
[29] Career Trainings (Workforce Development), SEMPACT, https://utrc2.org/sempact#WorkforceDevelopment (last visited June 17, 2026).

**IV.  Defendants' Abrupt Termination of SEMPACT's Grant and Designation as Region 2 UTC, and the Resulting Harm**

44.    Less than two weeks after emailing about the third installment of grant funds, Mr. Singh emailed Dr. Kamga and the other Center Directors to inform them of "a pause in issuing continuation funding for previously awarded grants, which directly affects planned obligations to UTC grantees."  According to the email, DOT—or at least the office responsible for administering the grant—"continue[d] to hold the UTC Program, and the professors and students who conduct and implement the research, in highest regard."  Mr. Singh also praised the "partnerships" between the universities and DOT as "long-standing and fruitful."

45.    About two months later, Mr. Singh followed up with Dr. Kamga and the other Center Directors about the pause, explaining that receipt of the "previously competed grants" would now be contingent on compliance with "current Administration priorities and Executive Orders (EOs) that address energy, climate change, diversity and gender, and economic analysis, and other priorities."  Notably, this email offered no indication that the grants were subject to termination.  Instead, the email instructed the directors to ensure that projects covered by the "next year of funding" aligned with the new Administration's "Executive Orders and Memoranda" and mentioned only the possibility that "the UTC Program office . . . may ask to meet with those of you whose UTC has a major focus on such areas as equity or climate change to discuss possible changes to your grant's statement of work."

46.    Mr. Singh again emailed Dr. Kamga and the other Center Directors on April 28, 2025, attaching a letter from Secretary Duffy.  This letter, dated April 24 and addressed to "All Recipients of U.S. Department of Transportation Funding," purported to "clarify and reaffirm pertinent legal requirements, to outline the Department's expectations, and to provide a reminder of your responsibilities and the consequences of noncompliance with Federal law and the terms of

-15-

your financial assistance agreements."[30]  According to the letter, "[w]hether or not described in neutral terms, any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called 'diversity, equity, and inclusion,' or 'DEI,' goals, presumptively violates Federal law."[31]  This interpretation clearly contradicted many of the elements of the 2022 NOFO and guidance from the prior administration.[32]

47.    Just four days later, and without any meeting or other engagement, Defendants terminated the SEMPACT grant.  On May 2, 2025, Defendants announced the termination of "seven woke university grants" that purportedly "were used to advance a radical DEI and green agenda that were [sic] both wasteful and ran counter to the transportation priorities of the American people."[33]  According to Secretary Duffy, these grants were terminated because they funded, for example, "whether road improvement projects are racist."[34]  The SEMPACT grant was terminated because it was, according to the announcement, focused on "equitable transportation for the disadvantaged workforce."[35]  SEMPACT was also purged from DOT's public list of the IIJA-

---

[30] U.S. Dep't of Transp., Letter to Recipients of U.S. Dep't of Transp. Funding (Apr. 24, 2025), https://www.transportation.gov/sites/dot.gov/files/2025-04/Follow%20the%20Law%20Letter%20to%20Applicants%204.24.25.pdf.

[31] *Id.*

[32] Defendants later acknowledged that such guidance had actually imposed obligations on grant recipients and announced that they would not enforce DEI-related policies or guidance that applied to grant recipients.  U.S. Dep't of Transp., Letter to Recipients of U.S. Dep't of Transp. Funding (July 2, 2025), https://www.transportation.gov/sites/dot.gov/files/2025-07/SecDOT%20letter%20to%20recipients%20of%20FFA%2007022025.pdf.  Unfortunately, they did so only after terminating the SEMPACT grant.

[33] Press Release, U.S. Transportation Secretary Sean P. Duffy Defunds Woke University Grants (May 2, 2025), https://perma.cc/QT9H-E2N8.

[34] *Id.*

[35] *Id.*

designated regional UTCs, leaving Region 2 without a designee.[36]

48.     That same day, Mr. Singh emailed Dr. Kamga and other stakeholders to inform them that Defendants had terminated the SEMPACT grant because "the award no longer effectuate[d] program goals or agency priorities."  The termination letter, which was attached to that email and copied Dr. Kamga as the Center Director, attempted to justify the abrupt termination through an unprecedented and expansive interpretation of a provision in the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (2 C.F.R. Part 200), known as the OMB's Uniform Grant Guidance.  Specifically, the letter cited a provision that provides for termination of a federal grant "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4).[37]

49.     Incorrectly construing this clause to bestow them with unfettered authority to disregard or change established parameters of an ongoing program grounded in extensive statutory requirements, DOT identified its new priorities as, for the first time, "presently includ[ing]":

- promoting traditional forms of energy and natural resources to the greatest extent possible,

- ensuring that taxpayer dollars are used efficiently in ways that maximally benefit the American people and improve their quality of life, and

- ceasing to promote divisive diversity, equity, and inclusion initiatives that discriminate on the basis of race, national origin, or another protected characteristic.

---

[36] *See supra* note 24.

[37] Prior to October 1, 2024, this paragraph of the regulation appeared as paragraph (a)(2) with minor textual differences.

50.    On information and belief, this same rationale was included in every UTC Program grant termination letter.

51.    The termination letter then identified a handful of phrases from SEMPACT's 2022 application as purportedly inconsistent with these priorities:

> CUNY's language "to empower economically disadvantaged populations, including minorities, women, veterans…by improving equity of opportunity in an unequal infrastructure labor market" directly conflicts with agency priorities by targeting specific groups for enhanced opportunity.  Likewise, CUNY's "model for Transforming Minority Doctoral Students into Academia…to Increase Diversity of Faculty Across the University" and multiple references to "Equity" ("Our work will address…Equity…," "to promote equity and accessibility," and "equity-based project selection") all prescribe race- or sex-specific initiatives.  The SOW's cited work is inconsistent with DOT's priorities.

52.    DOT's shifting priorities did not provide a valid reason for terminating the SEMPACT grant or the consortium's designation as the Region 2 UTC.  Nothing in OMB's Uniform Guidance authorizes DOT to rewrite the UTC Programs' research goals and priorities midstream, let alone to then terminate an existing grant for having not complied with such objectives before they were even announced.[38]

53.    By its plain language, 2 C.F.R. § 200.340(b) requires an agency to "clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award," including which provisions of § 200.340(a) apply to a particular award, by setting out the

---

[38] Exactly two months after unlawfully terminating the SEMPACT grant, Defendants apparently realized that it did, in fact, lack the authority to retroactively and arbitrarily establish new grant criteria and terminate grants based on such criteria.  In a letter from Secretary Duffy to all recipients of DOT funding, Defendants announced that it would simply "no longer enforce [policies from the Biden Administration], or any other requirements incorporated into its Federal financial assistance agreements that are inconsistent with the policy objectives of this Administration and current DOT leadership."  U.S. Dep't of Transp., Letter to Recipients of U.S. Dep't of Transp. Funding (July 2, 2025), https://www.transportation.gov/sites/dot.gov/files/2025-07/SecDOT%20letter%20to%20recipients%20of%20FFA%2007022025.pdf.  According to the letter, Defendants had only then—as of July 2, 2025—"removed [Biden-era] requirements from its Federal financial assistance agreements." *Id.*

specific bases for termination in the agreement itself. In October 2024, OMB even revised 2 C.F.R. § 200.340 to "provide[] greater clarity on the policy for termination of awards . . . by underscoring the need . . . to clearly and unambiguously communicate termination conditions in the terms and conditions of the award." Guidance for Federal Financial Assistance, 89 Fed. Reg. 30,046, 30,089 (April 22, 2024). The SEMPACT grant agreement did not specify that the award could be terminated if the agency made a determination that the grant no longer effectuated agency goals or priorities—much less for not effectuating newly established goals or priorities.

54.     Moreover, Defendants' justifications—through the termination letter and the press release—grossly mischaracterized both SEMPACT's work and the phrases Defendants cherrypicked from SEMPACT's statement of work. Specifically, Defendants listed five examples of the SEMPACT grant's "cited work" as "inconsistent with DOT's priorities." But two of these examples did not describe the work of SEMPACT at all: one quote actually described the goals of an entirely separate entity that was merely listed in the application as an expected educational collaborator, and another quoted the title of a conference presentation listed on a faculty member's resume submitted as part of the grant application. The three remaining examples were brief references to or uses of the word "Equity." Defendants' contention that these references somehow "prescribe[d] race- or sex-specific initiatives" is simply false. Two of the instances were references to DOT's own "research priority" of "Equity," which grant applicants were encouraged to include. *See supra* ¶ 31. Defendants' remaining example—the application's use of the phrase "equity-based project selection"—had nothing to do with how SEMPACT selected research projects or what was required of SEMPACT researchers. Rather, that phrase merely appeared in the description of an "[a]nticipated [p]roduct" for a single proposed research project: an "[o]ptimization framework" model that would account for costs and benefits such as "improved

job access or public health outcomes for neighborhood residents," in addition to traditional metrics like travel time savings and reduced collision frequencies. Such an optimization framework could eventually be used, by local, state, or federal officials, to evaluate possible Intelligent Transportation System projects. Even if this research were somehow contrary to DOT's current priorities—which it is not—a single project would not justify the wholesale and summary termination of the entire grant.

55.    SEMPACT unsuccessfully attempted to appeal Defendants' decision to terminate its federal grant.

56.    Prior to May 2, 2025, SEMPACT had only used approximately $2.7 million of the grant funds from the first two installments but still had years to incur costs and request reimbursement for the remaining $3.3 million. Following the grant termination, SEMPACT no longer has access to these funds or the remaining approximately $9 million scheduled to be distributed over the following three years.

57.    Dr. Kamga has suffered immediate and substantial harm as a result of Defendants' actions. He has had to significantly slow or even halt his own critical research. And as Center Director, Dr. Kamga has had to reallocate considerable time to seeking new sources of funding for SEMPACT, hindering even his non-SEMPACT research. The grant termination has also injured Dr. Kamga's professional reputation as an effective manager of major federal awards. Additionally, Dr. Kamga has experienced other monetary damages as a result of the unlawful termination of the SEMPACT grant.

58.    Furthermore, valuable data and research have been lost because Dr. Kamga and more than 50 other academics and researchers have been unable to complete their planned SEMPACT-funded work. The grant's abrupt termination has also rendered useless the significant

investments in equipment, technology, and training made thus far under the SEMPACT grant. SEMPACT's inability to operate has in turn impacted regional and state transportation agencies and the local communities, who are left without the type of partnership, collaboration, and technical support SEMPACT anticipated providing.

59.     As Center Director, the SEMPACT grant supported Dr. Kamga's own salary and those of other faculty, researchers, and staff.  Consequently, SEMPACT, through Dr. Kamga, has had to lay off and forego hiring staff, research assistants, fellows, and graduate researchers, as well as find new sources of funding to replace the large and unexpected compensation gap due to loss of the SEMPACT grant.  To date, Dr. Kamga has been unable to find sufficient alternative funding. Additionally, the SEMPACT grant funded research by doctoral candidates whose dissertations are now stalled and who therefore face expiring funding windows, the loss of competitive fellowships, and delayed entry into the workforce.

60.     Moreover, the abrupt termination of the grant and the removal of SEMPACT as the Region 2 UTC jeopardizes other existing and future funding sources.  For example, as required by statute and the grant agreement, SEMPACT secured $15 million in matching funds from non-federal sources.  Without the federal funds, SEMPACT may not be able to satisfy the requirements of these grants.  And without its designation as the Region 2 UTC, SEMPACT may lose the matching funds altogether.  The disruption of the SEMPACT grant termination has also impaired the ability of Dr. Kamga and SEMPACT to compete for future grants from federal, state, or private sources by, among other things, reducing staff and researcher capacity.

61.     Ultimately, by slowing or halting the work of Dr. Kamga and the other SEMPACT researchers, Defendants' unlawful actions will harm communities across New York, New Jersey, Puerto Rico, the U.S. Virgin Islands, and beyond.

**CAUSES OF ACTION**

**COUNT I**
**Violation of the First Amendment**

62.     Dr. Kamga incorporates the above paragraphs as if fully set forth herein.

63.     The First Amendment provides that the federal government "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

64.     The First Amendment prohibits the government from "regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 829 (1995). "Discrimination against speech because of its message is presumed to be unconstitutional." *Id.* at 828. "[E]ven in the provision of subsidies, the Government may not aim at the suppression of dangerous ideas." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (cleaned up). Nor may the government reject "a whole class of projects . . . based on viewpoint alone," or use federal funding awards—such as the SEMPACT grant—"to drive certain ideas or viewpoints from the marketplace." *Rhode Island Latino Arts v. Nat'l Endowment for the Arts*, 777 F. Supp. 3d 87, 107 (D.R.I. 2025) (cleaned up) (quoting and discussing *Finley*, 524 U.S. at 587).

65.     Defendants' actions as alleged herein are "the product of invidious viewpoint discrimination." *Finley*, 524 U.S. at 587. Defendants terminated the SEMPACT grant based on the views reflected in its research and work—or at least the views as purportedly perceived by Defendants. Defendants did so in an effort to drive these viewpoints out of the marketplace of ideas. And Defendants' intent was clear from both their contemporaneous public statements and the termination letter itself. The Trump Administration singled out the SEMPACT grant, along with a few others, because the viewpoints purportedly conveyed in the grant's statement of work conflicted with the Trump Administration's views. Defendant Duffy issued a press release to

announce the grant terminations, criticizing the work at SEMPACT as "wasteful and divisive" and seeking to "advance a radical DEI and green agenda."[39] The termination letter pointed to a few phrases, like "economically disadvantaged populations, including minorities, women, veterans," and the use of the word "Equity" in the grant agreement's statement of work to find SEMPACT's work inconsistent with DOT's new priorities under the Trump Administration. In short, Dr. Kamga's research and work pursuant to the SEMPACT grant was targeted because it purportedly reflected viewpoints and beliefs disfavored by the Trump Administration.

66. Defendants also penalized Dr. Kamga's protected speech and abridged his academic freedom by withdrawing an already-awarded grant and terminating the consortium's Region 2 UTC designation because Dr. Kamga engaged in speech disfavored by the government. The termination therefore constituted not only viewpoint discrimination but also retaliation in violation of the First Amendment.

67. Defendants' actions alleged herein have an ongoing chilling effect on Dr. Kamga's speech. They signal to Dr. Kamga, and the broader research community, that the use of certain concepts in research agendas, program descriptions, presentation titles, or other scholarly work may be punished, even when those concepts were part of DOT's own published priorities at the time of application. This chilling effect is particularly acute in the context of the UTC Program, where research agendas and educational programming must be planned years in advance and where researchers must communicate candidly about program goals in competitive applications.

68. Defendants' actions are neither justified by any substantial or compelling government interest nor narrowly tailored to serve any such interest.

69. Accordingly, the Court should declare Defendants' actions unconstitutional.

---

[39] Sec. Duffy May 2 press release, *supra* note 33.

## COUNT II
### Violation of the Fifth Amendment's Equal Protection Guarantee

70. Dr. Kamga incorporates the above paragraphs as if fully set forth herein.

71. The Fourteenth Amendment guarantees "the equal protection of the laws." U.S. Const. amend. XIV, § 1.

72. This equal protection guarantee is applicable to the federal government and all its agencies, officials, and employees through the Due Process Clause of the Fifth Amendment. *See Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954).

73. These principles require "all persons similarly situated [to] be treated alike" by the federal government. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "There's no federal funding exception to the Equal Protection Clause." *City of Saint Paul v. Wright*, 816 F. Supp. 3d 65, 74 (D.D.C. 2026).

74. Defendants violated the Equal Protection Clause by targeting the SEMPACT grant for termination because of its connection to protected characteristics. Defendants made clear in the termination letter that they terminated the SEMPACT grant because it was funding research on "minorities" and "women," which the letter characterized as "race- or sex-specific initiatives." In Defendants' own words, then, Defendants' differential treatment was for the purpose of targeting at least two protected classes. The Trump Administration's broader efforts to purge federal grant programs of any diversity, equity, and inclusion efforts further demonstrate Defendants' animus in terminating the SEMPACT grant. Defendants' differential treatment based on these protected characteristics is neither justified by any substantial or compelling government interest nor narrowly tailored to serve any such interest.

75. Defendants also violated the Equal Protection Clause by targeting the SEMPACT grant for termination due to its association with a political viewpoint Defendants disfavor. The

Trump Administration, including Defendants, use terms like "woke," "DEI," and "radical" as a proxy for association with a particular political party. Defendants targeted grants effectuating what they view as a particular political party's agenda. Defendants' termination decision intentionally singled out a small subset of UTC grants for termination based on perceived ideological content and disfavored themes. Indeed, Defendants' public announcement emphasized the purportedly ideological content of the terminated projects rather than neutral performance-based criteria, criticizing the grants as part of a "Green New Scam." Defendants' selective termination of the SEMPACT grant based on the political ideology allegedly reflected in the research lacked a rational and lawful basis tied to the purposes of the UTC statute or the neutral administration of federal financial assistance.

76.     Defendants further violated the Equal Protection Clause by targeting the SEMPACT grant for termination on the basis of the voting patterns of the community SEMPACT serves. In identifying DOT grants to terminate in May 2025, Defendants intentionally treated certain UTCs, including SEMPACT, differently from similarly situated entities based on the political views of citizens in the city or state where the UTC was located, and the city or state where the relevant award would be primarily performed. Defendants' differential treatment of these UTCs, including SEMPACT, is motivated by animus against the political views of and votes cast by the citizens of the cities and states associated with the awards, based on the location of the UTC or where the award would be performed. Terminating the grant for this reason lacked a rational and lawful basis tied to the purposes of the UTC statute or the neutral administration of federal financial assistance.

77.     As a direct and proximate result of Defendants' differential treatment, Dr. Kamga— as both a principal investigator relying on the SEMPACT award and the Center Director—has

suffered concrete economic and non-economic harm, including loss of funding, loss of funding opportunities, loss of access to federally funded programs and resources, loss of investments, costs of mitigation, diversion of resources, reputational harm, and chilled speech and association.

78.    Accordingly, the Court should declare Defendants' actions unconstitutional.

## COUNT III
### Violation of the Fifth Amendment's Procedural Due Process Protections

79.    Dr. Kamga incorporates the above paragraphs as if fully set forth herein.

80.    The Fifth Amendment guarantees that no person be "deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.

81.    The Due Process Clause of the Fifth Amendment requires due process of law before the deprivation of a constitutionally protected interest and fair notice of what conduct is forbidden or required.

82.    Defendants' abrupt termination deprived Dr. Kamga of constitutionally protected liberty and property interests without due process.  Dr. Kamga's liberty and property interests include his ability to pursue his profession as an academic researcher and principal investigator, his professional reputation associated with stewardship of major federal awards, and his concrete economic and professional reliance on a multi-year federal research award under his direction.

83.    Defendants provided no meaningful pre-deprivation process.  They did not provide advance notice of a grant-specific concern tied to the actual implementation of the research.  They did not provide a meaningful opportunity for Dr. Kamga to be heard.  They did not offer a corrective-action pathway tailored to actual program practices.  In fact, they did not engage in any way before terminating the grant, even though they suggested they would.  *See supra* ¶ 45. Defendants instead relied on selective quotations and a biased characterization of language in SEMPACT's statement of work to summarily terminate the grant.

84. Defendants also failed to provide fair notice of what conduct was required to avoid termination. By treating general, undefined concepts and words—especially concepts and words explicitly responsive to the NOFO's prescribed priorities—as grounds for termination after the award was made and reaffirmed, Defendants imposed an uncertain and retroactive standard that invites arbitrary enforcement and undermines the stability required for multi-year research programs.

85. Accordingly, the Court should declare Defendants' actions unconstitutional.

## COUNT IV
### Violation of the Administrative Procedure Act:
### Contrary to Constitutional Right – First Amendment (5 U.S.C. § 706(2)(B))

86. Dr. Kamga incorporates the above paragraphs as if fully set forth herein.

87. The APA directs courts to "hold unlawful and set aside agency action" that is "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

88. Defendants' termination decision, including the termination of both the SEMPACT grant and SEMPACT's designation as the Region 2 UTC, and the establishment of new priorities are reviewable under the APA because they are final agency action that directly affected Dr. Kamga's rights and imposed immediate consequences.

89. As alleged in Count I, Defendants' actions are contrary to the constitutional rights enshrined in the First Amendment, and Dr. Kamga has suffered a legal wrong as a result of those actions.

90. Accordingly, the Court should hold unlawful and vacate Defendants' actions.

## COUNT V
### Violation of the Administrative Procedure Act:
### Contrary to Constitutional Right – Fifth Amendment (5 U.S.C. § 706(2)(B))

91.    Dr. Kamga incorporates the above paragraphs as if fully set forth herein.

92.    The APA directs courts to "hold unlawful and set aside agency action" that is "contrary to constitutional right."  5 U.S.C. § 706(2)(B).

93.    Defendants' termination decision, including the termination of both the SEMPACT grant and SEMPACT's designation as the Region 2 UTC, and the establishment of new priorities are reviewable under the APA because they are final agency action that directly affected Dr. Kamga's rights and imposed immediate consequences.

94.    As alleged in Counts II and III, Defendants' actions are contrary to the constitutional rights of equal protection and due process enshrined in the Fifth Amendment, and Dr. Kamga has suffered a legal wrong as a result of those actions.

95.    Accordingly, the Court should hold unlawful and vacate Defendants' actions.

## COUNT VI
### Violation of the Administrative Procedure Act:
### In Excess of Statutory Jurisdiction, Authority, or Limitations (5 U.S.C. § 706(2)(C))

96.    Dr. Kamga incorporates the above paragraphs as if fully set forth herein.

97.    The APA directs a reviewing court to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(C).

98.    Defendants' termination decision, including the termination of both the SEMPACT grant and SEMPACT's designation as the Region 2 UTC, and the establishment of new priorities are reviewable under the APA because they are final agency action that directly affected Dr. Kamga's rights and imposed immediate consequences.

99.    Defendants have no constitutional or statutory authority to abruptly and unilaterally terminate the SEMPACT grant or its designation as the Region 2 UTC.  Defendants' termination

decision is in excess of statutory jurisdiction, authority, or limitations because Defendants applied a retroactive and undisclosed policy that treated compliance with the NOFO's published priorities as a basis for later termination. Defendants cannot lawfully transform established competition criteria into a post-award enforcement cudgel that cancels already-awarded grants based on a change in political viewpoint, absent lawful procedures and lawful non-retroactive standards consistent with the authorizing statute and the governing regulatory framework.

100. Nor does OMB's Uniform Grant Guidance provide Defendants with such unfettered authority. Defendants' actions are contrary to a reasonable interpretation of 2 C.F.R. § 200.340, historical practice, prior agency guidance related to the regulation, and the structure of the grant program as established by Congress.

101. In addition, Defendants' new priorities, and the grant terminations pursuant to those new priorities, directly contradict the statute governing the UTC Program. Congress directed the Secretary of Transportation to base grant selection, in part, on a "demonstrated commitment" to transportation workforce development through "outreach activities to attract new entrants into the transportation field, including women and underrepresented populations." 49 U.S.C. § 5505(b)(4)(B)(v)(II). And yet, Defendants used the mere mention of such activities as a reason to terminate the SEMPACT grant.

102. Accordingly, the Court should hold unlawful and vacate Defendants' actions.

### COUNT VII
### Violation of the Administrative Procedure Act:
### Without Observance of Procedure (5 U.S.C. § 706(2)(D))

103. Dr. Kamga incorporates the above paragraphs as if fully set forth herein.

104. The APA directs a reviewing court to "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

105. Defendants' termination decision, including the termination of both the SEMPACT

grant and SEMPACT's designation as the Region 2 UTC, and the establishment of new priorities are reviewable under the APA because they are final agency action that directly affected Dr. Kamga's rights and imposed immediate consequences.

106. Defendants' termination decision was issued without observance of procedure required by law. For example, Defendants did not appear to act pursuant to—or indeed even have in place—the procedures required by 2 C.F.R. § 200.342. Defendants terminated the SEMPACT grant and the Region 2 UTC designation effective immediately without an adequate process to provide fair notice, to allow a meaningful response regarding the grant's actual implementation, or to address the reliance interests inherent in the multi-year UTC award structure. Defendants' actions imposed sweeping consequences on Dr. Kamga and an ongoing research enterprise without a process commensurate with the magnitude of the deprivation.

107. Dr. Kamga, as both a principal investigator relying on the funds and the Center Director responsible for administering them, has been and will continue to be harmed by Defendants' unlawful actions, including ongoing disruption, closeout burdens, reputational harm, and continued impairment of his—and others'—ability to perform his research and other critical educational functions.

108. Accordingly, the Court should hold unlawful and vacate Defendants' actions.

## COUNT VIII
### Non-Statutory Review *Ultra Vires* – Executive Action in Excess of Statutory Authority

109. Dr. Kamga incorporates the above paragraphs as if fully set forth herein.

110. Federal courts have the power in equity to grant injunctive relief with respect to violations of federal law by federal officials. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

111. Congress established objectives for the UTC Program and set forth detailed

parameters to govern its implementation, including the process and criteria for designating and awarding grant funding to UTCs. Defendants are statutorily required to implement the UTC Program according to these parameters.

112. Nothing in the IIJA or any other statute provides Defendants with the authority to rewrite criteria for using the funds once lawfully awarded or to terminate grants arbitrarily based on a new administration's different policy preferences.

113. Defendants' interpretation of their authority is incompatible with the purpose of the UTC Program as defined by Congress, *see supra* ¶¶ 25–27, and contradicts the very language of the statute, *see supra* ¶¶ 26–27, 101.

114. Accordingly, the Court should declare Defendants' actions *ultra vires*.

## PRAYER FOR RELIEF

For these reasons, Dr. Kamga respectfully requests that the Court enter judgment in his favor and award the following relief:

 A. Declare as unconstitutional, unlawful, and *ultra vires* Defendants' May 2, 2025 termination decision;

 B. Vacate and set aside Defendants' May 2, 2025 termination decision and the establishment of new priorities;

 C. Enjoin Defendants from enforcing or giving effect to the May 2, 2025 termination decision or any similar future action, including by imposing or continuing closeout and clawback consequences premised on the unlawful termination;

 D. Enjoin Defendants from terminating, conditioning, or threatening to terminate grant funds in the absence of constitutional and statutory authority or otherwise in violation of applicable constitutional protections, law, and procedure;

E.  Award attorneys' fees and costs to the extent permitted by law; and

F.  Grant any such other and further relief as the Court deems just and proper.


Dated: June 23, 2026                                Respectfully submitted,


                                                    /s *Sarah S. Normand*
                                                    Sarah S. Normand (NY Bar No. 2783496)
                                                    Amy Powell*
                                                    Kunyu Ching*
                                                    **Lawyers for Good Government**
                                                    319 F St. N.W. Ste 301, PMB 181
                                                    Washington, DC 20004
                                                    914-787-9335 (Normand)
                                                    646-246-4633 (Powell)
                                                    sarah@lawyersforgoodgovernment.org
                                                    amy@lawyersforgoodgovernment.org
                                                    kunyu@lawyersforgoodgovernment.org

                                                    Kathleen Shelton (DC Bar No. 1619066)*
                                                    Margaret (Emmy) Wydman (DC Bar No.
                                                    90007646)*
                                                    **Civil Service Law Center LLP**
                                                    1455 Pennsylvania Ave NW, Suite 400
                                                    Washington, DC 20004
                                                    202-505-7920
                                                    kshelton@civilservicellp.com
                                                    ewydman@civilservicellp.com

                                                    *Counsel for Plaintiff Dr. Kamga*

                                                    **pro hac vice* application forthcoming